619 S.E.2d 187

**Richard F. FRYE, Plaintiff Below, Appellee,**

v.

**Richard L. FRYE, and C.E. Frye Farms, Inc., Defendants Below, Appellants.**

No. 32160.

Supreme Court of Appeals of West Virginia.

Submitted April 6, 2005.

Decided June 30, 2005.

Dissenting Opinion of Chief Justice Albright July 6, 2005.

Clyde M. See, Jr., See & See, Joyce E. Stewart, Saville & Stewart, Moorefield, for the Appellants.

John G. Ours, Petersburg, for the Appellee.

PER CURIAM.

The defendants below and appellants herein, Richard L. Frye (hereinafter referred to as "Richard Frye") and C.E. Frye Farms, Inc. (hereinafter referred to as "Frye Farms"), appeal from a final decision by the Circuit Court of Hampshire County, in favor of the plaintiff below and appellee herein, Richard F. Frye (hereinafter referred to as "Rick Frye"). On appeal, Richard Frye[1] assigns two separate errors:[2] (1) the circuit court erred in finding that certain stocks were properly issued to Rick Frye, and (2) the circuit court erred in finding that Rick Frye paid valuable consideration for the

---

1. Richard Frye and Frye Farms are represented by the same counsel, and will be referred to, collectively, as "Richard Frye."

2. We recognize that Richard Frye set forth five assignments of error; however, the alleged misjudgments are encompassed by the two errors discussed in this opinion.

stocks. As cross-assignments of error,[3] Rick Frye assigns two separate errors: (1) the circuit court erred when it declined to award him attorney's fees in the dissolution action, and (2) the circuit court erred when it declined to award Rick Frye compensation for his years of unpaid service at Frye Farms. Upon a review of the parties' arguments, the record submitted for appellate consideration, and the pertinent authorities, we affirm the decision of the circuit court.

## I.

### FACTUAL AND PROCEDURAL HISTORY

Frye Farms is a closely-held family farming corporation. It was incorporated in 1961 with 700 shares of capital stock authorized and issued. In 1982, Richard Frye came to live on the farm and work as the farm manager. Richard Frye's son, Rick Frye, came to live and work on the family farm in 1985. A shareholder's meeting was held in 1985, and the minutes of the meeting indicate that Rick Frye was employed as a full-time employee of Frye Farms and was to receive $75.00 per week for his labor on the farm. He also was permitted to live in a corporately-owned house with almost no expenses[4] and was allowed use of the realty for his personal cattle operation. The corporate minutes reflect that Rick Frye received compensation for a total of three years, and did not receive monetary compensation thereaf-

ter because the corporation was unable to pay him. For health reasons, Richard Frye resigned as farm manager and Rick Frye was appointed farm manager, effective January 1, 1995. At this time, Rick Frye received sixty shares of treasury stock for his years of service and improvements to the farm.[5]

In 1997, four stockholders,[6] owning a total of 240 shares of stock, instituted a civil action seeking a dissolution of Frye Farms. Pursuant to the circuit court order, the corporate assets were sold at a public auction, and a per value share was established. The four remaining shareholders; Richard Frye, Linda Frye,[7] Dorothy Novak,[8] and Rick Frye, along with non-shareholder, Fred Novak,[9] desired to find a way to keep the farm. Subsequent to the 1997 dissolution proceeding, ownership of Frye Farms was held by Richard Frye, Linda Frye, Rick Frye, and Dorothy Novak, and the 240 reacquired stock shares were designated as treasury or non-issued stock. The cost of buying out the minority shareholders, along with the associated costs and fees, required Frye Farms to borrow $374,900.00 on two bank notes. Fred Novak contributed $100,000.00 towards the repayment of the bank notes. The source of the funds used to pay the bank notes is a point of contention on appeal and will be discussed later in this opinion.

Thereafter, 120 shares of the reacquired stocks were issued to Rick Frye. On February 25, 1998, Richard Frye signed at least

---

**3.** Rule 10(f) of the West Virginia Rules of Appellate Procedure provides:

> Appellee, if he is of the opinion that there is error in the record to his prejudice, may assign such error in a separate portion of his brief and set out authority and argument in support thereof. Such cross assignment may be made notwithstanding the fact that appellee did not file a separate petition for an appeal within the statutory period for taking an appeal. Appellant may answer the cross assignment of error in his reply brief.

Richard Frye did not file a reply brief and, therefore, did not respond to Rick Frye's cross-assignments of error in written form.

**4.** Rick Frye did not pay rent for his use of the corporation's house, and expenses such as property insurance and utilities were paid by Frye Farms.

**5.** These sixty stocks are represented by Stock Certificate Number 9, and the validity of the issuance of these stock shares is not in dispute by the parties.

**6.** These former stockholders are not parties to the matter before this Court.

**7.** Linda Frye was married to Richard Frye at the time of the 1997 dissolution and is the mother of Rick Frye.

**8.** Dorothy Novak is Richard Frye's sister and is Rick Frye's aunt. Dorothy Novak is married to Fred Novak.

**9.** Fred Novak is married to Dorothy Novak, and is Rick Frye's uncle. As previously noted, Fred Novak is not a shareholder of Frye Farms.

two stock certificates.[10] Richard Frye asserts that he signed the certificates to replace certificates lost by the former shareholders from the 1997 dissolution proceeding (but that were subsequently found). Rick Frye and Linda Frye assert, and the circuit court agreed, that the stocks were issued to Rick Frye. Stock Certificate No. 11, dated February 25, 1998, bears Richard Frye's signature[11] and Linda Frye's signature,[12] and the names of "Linda B. Frye or Richard F. Frye, j/t" as owners of the sixty shares; and Stock Certificate No. 13, dated February 25, 1998, bears Richard Frye's signature and Linda Frye's signature, and the names of "Richard F. Frye or Linda B. Frye, j/t" as owners of the sixty shares. Richard Frye testified that he signed the certificates when they were blank and that he did not realize they had been issued to Rick Frye until the spring of 2000 when he saw copies of the certificates.

Meanwhile, as the years progressed with Rick Frye as farm manager, Rick and Richard Frye began to disagree about the proper way to run Frye Farms. Physical altercations and arrests ensued until Rick Frye returned home one day in July 2002 to find that the locks had been changed on the corporate home where he had been living. Rick Frye filed suit on August 9, 2002, requesting a dissolution of Frye Farms. A bench trial followed and the circuit court ordered a dissolution of the corporation[13] pursuant to W. Va.Code § 31D–14–1430(2) (2002) (Repl.Vol. 2003)[14] based on the finding that the corporation had failed to elect a board of directors as required by law,[15] and that Richard Frye's actions amounted to oppressive conduct. In its November 7, 2003, order, the circuit court found that Stock Certificates Numbers 11 and 13 were validly issued to Rick Frye, and that Rick Frye contributed approximately $292,896.70 as consideration for the 120 stock shares.

Post-judgment motions were filed by both parties. By order entered February 9, 2004, the circuit court denied Richard Frye's motion for a new trial, and further declined to award Rick Frye his attorney's fees or compensation for his unpaid years of service to Frye Farms. On appeal to this Court, Richard Frye asserts the circuit court erred in holding that the 120 stocks, represented by Stock Certificates Numbers 11 and 13, were validly issued to Rick Frye for fair and adequate consideration. Rick Frye cross-claims and appeals to this Court the issues of attorney's fees and compensation for services rendered.

---

10. Before the circuit court, Richard Frye testified that he signed four blank stock certificates. However, his testimony changed during cross-examination and questioning by the circuit court judge. There is no dispute that his signature appears on the two stock certificates at issue, Number 11 and 13.

11. There is no dispute that Richard Frye, as president of Frye Farms, is authorized to sign stock certificates for issuance.

12. Linda Frye was the secretary of Frye Farms, and there is no dispute that she was authorized to sign stock certificates in her capacity as its secretary.

13. The order of dissolution is not an issue on appeal to this Court. Rather, the issue is one of the validity of Rick Frye's stock. The number of stock owned by Rick Frye becomes supremely relevant in a dissolution proceeding if the remaining shareholders or the corporation desires to purchase the shares owned by the petitioning shareholder pursuant to W. Va.Code § 31D–14–1434 (2002) (Repl.Vol.2003).

14. The relevant portions of W. Va.Code § 31D–14–1430(2) provide:

> The circuit court may dissolve a corporation:
> ....
> (2) In a proceeding by a shareholder if it is established that:
> ....
> (B) The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive or fraudulent;
> (C) The shareholders are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired[.]

15. It appears the corporation was run rather loosely. A meeting of shareholders was not held yearly as required by the corporate bylaws, and prior to the institution of the suit giving rise to this appeal, the corporation never elected a board of directors. On August 12, 2002, a special meeting was held in response to the August 9, 2002, filing of the dissolution suit by Rick Frye. The first directors were elected during this meeting.

## II.

### STANDARD OF REVIEW

■ The standard of review concerning appeals to this Court from non-jury trials, or bench trials, is set forth in Syllabus Point 1 of *Public Citizen, Inc. v. First National Bank*, 198 W.Va. 329, 480 S.E.2d 538 (1996):

In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an · abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

With these standards in mind, we now consider the parties' arguments.

## III.

### DISCUSSION

On appeal to this Court, Richard Frye presents two grounds for reversal. First, he challenges the circuit court's finding that the 120 shares of stock, represented by Certificate Numbers 11 and 13, were properly issued to Rick Frye. Richard Frye asserts that stock issuance takes the consent of the board of directors and the shareholders, and that such consent, express or implied, was lacking in this exchange. Second, Richard Frye contends that Rick Frye paid no consideration for the 120 shares of stock, and argues that Rick Frye used money that belonged to Richard Frye to pay for the debts of the farm, and further, that certain corporate monies were improperly credited to Rick Frye.

On cross-appeal to this Court, Rick Frye presents two arguments for our consideration. First, he asserts that the circuit court erred in not awarding him attorney's fees pursuant to W. Va.Code § 31D–14–1434(e).[16] Second, Rick Frye argues he was entitled to compensation for the seven and one-half

years he worked as the farm manager without monetary compensation. Following a review of the record, we find that the circuit court's underlying factual findings are not clearly wrong; and further, that the circuit judge did not abuse his discretion in reaching the ultimate disposition set forth in the final order. We first turn to the issue of the validity of the stock issuance, which necessitates a discussion of the consideration paid for the stocks. The discussion will then shift to Rick Frye's cross-assignments of error.

### A. Validity of Stock Issuance

The precipice of our determination must necessarily be whether Stock Certificates No. 11 and 13 were validly issued to Rick Frye. "The board of directors may authorize shares to be issued for consideration consisting of any tangible or intangible property or benefit to the corporation, including cash, promissory notes, services performed, contracts for services to be performed or other securities of the corporation." W. Va.Code § 31D–6–621(b) (2002) (Repl.Vol.2003). Therefore, to determine the validity of Rick Frye's stock represented by Stock Certificates Number 11 and 13, we must determine whether the stocks were issued to Rick Frye and what, if any, consideration was paid by Rick Frye for the stocks.

We will first address the issuance of the stocks. We note that the law requires that

[b]efore the corporation issues shares, the board of directors must determine that the consideration received or to be received for shares to be issued is adequate. That determination by the board of directors is conclusive insofar as the adequacy of consideration for the issuance of shares relates to whether the shares are validly issued, fully paid and nonassessable.

W. Va.Code § 31D–6–621(c) (2002). If it is determined that the corporation issued the shares to Rick Frye, the law states that it is conclusive that the consideration received was adequate.

---

**16.** W. Va.Code § 31D–14–1434 provides in relevant part:

(e) .... If the court finds that the petitioning shareholder had probable grounds for relief under paragraph (B) or (D), subdivision (2),

section one thousand four hundred thirty [§ 31D–14–1430] of this article, it may award to the petitioning shareholder reasonable fees and expenses of counsel and of any experts employed by him or her.

Testimony before the circuit court revealed two different versions surrounding Stock Certificates Numbers 11 and 13, each issued for sixty shares and dated February 25, 1998. Linda Frye testified that on February 25, 1998, she was in the kitchen with Richard Frye and Rick Frye. Richard Frye directed Linda Frye, as secretary of Frye Farms, to prepare two stock certificates for Rick Frye. Linda Frye prepared Stock Certificate Number 11 and made a mistake on Certificate Number 12, which she voided. She then proceeded to complete Stock Certificate Number 13. Richard Frye then signed the stock certificates. Both Linda and Rick Frye testified that they witnessed Richard Frye sign the stock certificates, then Rick Frye directed that his mother's name be added to the certificates.

■ Conversely, Richard Frye testified that he signed four stock certificates for the re-issuance of stock to former stockholders who claimed they had lost their stock certificates. Richard Frye further maintained that the stock certificates were blank when presented to him for his signature. However, on cross-examination, Richard Frye's testimony regarding his signing of four stock certificates was shown to be an impossibility. He testified that he signed four stock certificates that were consecutively numbered. Because it is undisputed that he signed stock certificate numbers 11 and 13, he could have only signed four consecutively-numbered certificates if they were numbers 10, 11, 12 and 13, or 11, 12, 13, and 14. However, stock certificate number 12, which was the certificate that Linda Frye testified she had made a mistake on and had voided, was presented and clearly did not have Richard Frye's signature on it. It is impossible that Richard Frye could have signed stock certificate Number 9 on February 25, 1998, because Number 9 was the original sixty shares issued to Rick Frye and was signed in December 1994. Therefore, the circuit court was not clearly wrong in discrediting Richard Frye's factual recitation. Based on the testimony and evidence presented, the circuit court was not clearly wrong in finding that Stock Certificates Numbers 11 and 13 were issued to Rick Frye.

■ We pause briefly to address Richard Frye's argument that no meeting occurred and that the board of directors did not approve the issuance of the stock as required under W. Va.Code 31D–6–621. To address this issue, we take notice of the fact that Frye Farms never elected a board of directors until August 12, 2002. However, this failure is not fatal to the validity of the stocks issued to Rick Frye on February 25, 1998. The law requires that each corporation must have a board of directors. W. Va.Code § 31D–8–801 (2002) (Repl.Vol.2003). The qualifications of a director are to be set forth in the bylaws of the corporation. W. Va. Code § 31D–8–802 (2002) (Repl.Vol.2003). An examination of the bylaws of Frye Farms reveals that "[t]he business of the corporation shall be controlled by a board of directors of three members, each of whom shall own at least five shares of common stock in the corporation." While Frye Farms did not have a board of directors, the only persons qualified to hold that position, according to the corporate bylaws, were shareholders. On February 25, 1998, when the stock certificates in dispute were signed, all shareholders of Frye Farms were present either in person or by proxy. Dorothy Novak was the only shareholder not present; however, Richard Frye was authorized to vote on her behalf by proxy under W. Va. Code § 31D–7–722 (2002) (Repl.Vol.2003).

■ We have previously held that "[w]here a corporation issues stock ... with the consent and participation of all the stockholders, and there is no charter, statutory or constitutional provision rendering the transaction void, the agreement is valid and binding as against the corporation, and it [cannot] afterwards repudiate the agreement ... or compel [the stockholder] to pay the difference between the par value of the stock and what has been paid or agreed upon as full payment for it." Syl. pt. 1, in part, *Vasey v. New Export Coal Co.*, 89 W.Va. 491, 109 S.E. 619 (1921). Moreover, "[w]here all the stockholders and officers of a corporation participate without dissent in an informal meeting thereof ... they, as well as the corporation, are estopped to deny the legality of the meeting." Syl. pt. 1, in part, *Kearneysville*

*Creamery Co. v. American Creamery Co.,* 103 W.Va. 259, 137 S.E. 217 (1927). Therefore, while the gathering on February 25, 1998, that resulted in the issuance of Stock Certificates Number 11 and 13 was indeed informal, it was valid because it constituted an action by the shareholders who were the only persons authorized under the corporate bylaws to hold the position as directors.

■ As previously discussed, because the corporation issued the shares to Rick Frye, it is conclusive that the consideration received was adequate under W. Va.Code § 31D–6–621(c). However, to buttress the finding that Rick Frye paid valuable consideration for the stocks, we acknowledge that under W. Va. Code § 31D–6–621(b), stocks can only be "issued for consideration consisting of ... [a] benefit to the corporation, including cash ... [or] services performed." Rick Frye asserted before the circuit court that his many years of unpaid service to Frye Farms, as well as his payment of almost $293,000.00 toward bank notes, constituted valid consideration for payment of the stocks. The circuit court found that Rick Frye never had a written contract for employment, and found he was amply compensated in the fact that he lived on the farm and was not required to pay rent, utilities, or insurance. Further compensation was found by Rick Frye's use of the corporation's land for his own personal cattle business. Rick Frye's lack of monetary compensation could not be the sole basis to find valid consideration; however, the circuit court found that Rick Frye contributed $292,896.70, to Frye Farms, which constituted valid consideration for the stocks.

It is undisputed that Fred Novak contributed $100,000.00 toward the payment of the bank notes. The issue on appeal is whether this amount should be credited as payment from Rick Frye on the assertion that the money was a gift to Rick Frye so that he could keep the farm, or whether the money should be credited to the corporation as an investment by Fred Novak in the corporation that his wife was a partial owner. The circuit court heard evidence that, during the 1997 dissolution suit, Fred Novak had participated in conversations wherein Rick Frye stated his intent to try to keep the farm, but voiced his concerns that he could not afford to pay the appraised value of the stock to acquire the outstanding stock. It was at this time that Fred Novak offered $100,000.00 so that Rick Frye could keep the farm. Fred Novak came to the farmhouse and in the presence of Richard Frye, Linda Frye, and Dorothy Novak, delivered two checks to Linda Frye, totaling $100,000.00. Rick Frye and Linda Frye testified that this money was to help Rick Frye keep the farm; whereas, Dorothy Novak asserted that the money was for the benefit of the family to keep the farm. Significantly, Fred Novak was present at the trial, but was not called as a witness on behalf of Richard Frye or Frye Farms. The money was deposited into Rick Frye's account, and there is no dispute that it was used to pay off the initial bank note on January 2, 1998, in the amount of $106,920.16.

Rick Frye asserts that he also contributed $131,351.50, toward payment of the second note. The circuit court recognized that a significant portion of the proceeds originated as gifts from Linda Frye to Rick Frye; however, the testimony supported that these gifts were made to Rick Frye and that he used this money to pay toward the second note. Moreover, it was found that Rick Frye contributed $54,625.04, towards the construction of a new home on the property of Frye Farms. Therefore, the circuit court found that Rick Frye contributed a total of $292,896.70, to reacquire the outstanding stock relinquished during the 1997 dissolution proceeding. It is undisputed that Frye Farms accepted and allowed Rick Frye to contribute these monies toward the corporation and the bank notes.

On appeal, Richard Frye and Frye Farms argues that the circuit court improperly credited an amount of $92,000.00 to Rick Frye, when in fact, it was from the sale of corporate timber and was applied to the bank notes. We do not find support for this proposition in the record. A review of the record shows that the circuit found that "[t]he total contributions by Rick Frye from his earnings and gifts for the benefit of the corporation amount to approximately $292,896.70." In reaching this amount, the circuit court to-

taled all of the monetary gifts that Rick Frye applied to the bank notes, the $100,000.00 gifted from Fred Novak, the money Rick Frye made with his personal cattle business, and the money that Rick Frye contributed for the construction of a new home on the corporate land. Richard Frye contends that Rick Frye's lack of a salary makes it impossible for him to have contributed such a large sum of money. However, the circuit court acknowledged that a large portion of the money credited to Rick Frye was gifted money. Based on the monies contributed by Rick Frye toward the payment of the bank notes, along with the many years of uncompensated service that Rick Frye gifted to the corporation, the circuit court found that Rick Frye gave fair and adequate consideration for the 120 shares of stock represented by Stock Certificates Numbers 11 and 13. The underlying factual findings made by the circuit court are not clearly wrong, and the court did not abuse its discretion in reaching its ultimate conclusion. Therefore, we affirm the circuit court's finding that the 120 stock shares represented by Stock Certificates Number 11 and 13 were validly issued to Rick Frye and further affirm the decision that Rick Frye paid adequate consideration for the stocks.

### B. Cross–Assignments of Error

On appeal to this Court, Rick Frye asserts cross-assignments of error pursuant to Rule 10(f) of the West Virginia Rules of Appellate Procedure.[17] First, he asserts that the circuit court erred in not awarding him attorney's fees pursuant to W. Va.Code § 31D–14–1434(e).[18] Second, Rick Frye argues he was entitled to compensation for the seven and one-half years he worked as the farm manager without monetary compensation.

■ First, Rick Frye asserts that because the circuit court ordered a dissolution of the corporation, he is entitled to receive attorney's fees under W. Va.Code § 31D–14–1434(e). The relevant portion of that code section states that "[i]f the court finds that the petitioner shareholder had probable grounds for relief under . . . [§ 31D–14–

1430(2)(B) or (D) ] . . . it may award to the petitioning shareholder reasonable fees and expenses of counsel[.]" While we have held that the use of the word "shall" connotes a mandatory intent, this code section uses the word "may" to emphasize the discretionary nature of its intent. *See State v. Allen,* 208 W.Va. 144, 153, 539 S.E.2d 87, 96 (1999) ("Generally, 'shall' commands a mandatory connotation and denotes that the described behavior is directory, rather than discretionary." (citations omitted)); Syl. pt. 1, *E.H. v. Matin,* 201 W.Va. 463, 498 S.E.2d 35 (1997) ("It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation."(citation omitted)). *Keplinger v. Virginia Elec. and Power Co.,* 208 W.Va. 11, 21–22, 537 S.E.2d 632, 642–43 (2000). Based on the language of the statute, the circuit court could award attorney's fees, but such an award was not mandated.

In areas in which the trial court is vested discretion, we have held that " '[w]here the law commits a determination to a trial judge and his discretion is exercised with judicial balance, the decision should not be overruled unless the reviewing court is actuated, not by a desire to reach a different result, but by a firm conviction that an abuse of discretion has been committed.' *Intercity Realty Co. v. Gibson,* 154 W.Va. 369, 377, 175 S.E.2d 452, 457 (1970) [*overruled on other grounds by Cales v. Wills,* 212 W.Va. 232, 569 S.E.2d 479 (2002) ] [internal citations omitted]." *Covington v. Smith,* 213 W.Va. 309, 322–23, 582 S.E.2d 756, 769–770 (2003). In its November 7, 2003, order, the circuit court expressly found that "[t]he costs of this action are to be born by both parties equally." Thereafter, during the hearing on post-trial motions on January 28, 2004, the trial court again addressed the issue. The circuit court stated that the request was previously considered and not granted because it was not mandatory. The trial court did not abuse its discretion in denying an award of attorney's fees.

---

**17.** See note 3, *supra,* for the relevant language of Rule 10(f).

**18.** See note 16, *supra,* for the relevant language of W. Va.Code § 31D–14–1434.

Second, Rick Frye asserts that he is entitled to compensation for the seven and one-half years he worked without compensation as the farm manager. He asserts that he received sixty shares for uncompensated work as a farm employee, and should be similarly rewarded for his uncompensated time in the more demanding position of farm manager. The November 7, 2003, order from the circuit court specifically stated

[T]he Court further finds that Rick Frye is not entitled to compensation in any amount for his services rendered for the benefit of the corporation as he has validly received a total of 180 shares of Charles E. Frye Farms, Inc. stock, as well as (a) the free use of a corporate house, (b) by the corporation paying all electricity for the corporate house, (c) by the corporation paying all casualty insurance on the corporate house, (d) by the corporation paying all taxes on the corporate house and (e) by the farm manager's use of the corporate farm's machinery and equipment for personal farming businesses. Moreover, Rick Frye also received permission to utilize corporate lands for the use of his cattle operation .... The Court also finds that Rick Frye knew the corporation was not financially able to pay him and, when compensation ceased, he did not quit his employment with the corporation or request to be paid.

The underlying factual findings made by the circuit court are not clearly wrong, and the court did not abuse its discretion in reaching its ultimate conclusion. Therefore, we affirm the circuit court's denial of Rick Frye's request for attorney's fees, and we further affirm the circuit court's demurrer of Rick Frye's petition for compensation for his years of service to Frye Farms.

## IV.

## CONCLUSION

For the foregoing reasons, we affirm the orders entered November 7, 2003, and February 9, 2004, by the Circuit Court of Hampshire County.

Affirmed.

ALBRIGHT, Chief Justice, dissenting.
(Filed July 6, 2005)

In affirming the circuit court's ruling, the majority has overlooked the fact that many of the trial court's rulings centered on issues that were heavily disputed below. For example, the evidence regarding the issuance of stock certificate numbers 11 and 13 and the question of whether there was valid consideration for such stock certificates conflicted greatly. While the circuit court apparently chose to discredit Appellant's testimonial accounts in favor of Appellee, the lower court never expressly indicated that it found Appellant to be lacking in credibility. Upon inquiry, the rationales upon which the circuit court relied to resolve these critical issues concerning the stock issuance are easily dissected and less than convincing. Of further concern is the fact that the trial court appears to have discarded any appreciation for the motivations underlying the acts and testimony of both Appellee and his mother (a disgruntled son and an ex-wife), who appear to have been acting in concert for the purpose of advancing Appellee's interests.

Inexplicably, the trial court accepted the testimony of Appellee and his mother as to the issuance of the disputed stock certificates, numbers 11 and 13. With little explanation, the trial court completely discounted the contradictory evidence offered by both Appellant and his sister, Dorothy Novak, regarding the origin of these stock certificates. Appellant testified that he recalled signing four stock certificates in blank for the express purpose of replacing stock certificates that had been lost by four shareholders who instigated the buyout proceedings in 1997.[1] When those "lost" certificates were later located, the stock certificates Appellant had signed in blank were no longer needed. Since Appellant had no knowledge of signing certificates for the questioned additional 120 shares of corporate stock in Appellee's name

---

1. Independent verification for the stock certificates being signed in blank was provided at trial by Appellant's ex-wife with reference to evidence previously offered by Appellant in 2001 during divorce proceedings involving Appellant and his ex-wife.

that are reflected by stock certificate numbers 11 and 13, Appellant suggested that the stock certificates signed in blank were wrongly used to issue the disputed additional shares of stock.

In resolving this issue, the trial court appears to have placed undue weight on the fact that Appellant saw the questioned stock certificates and failed to take timely action to repudiate the issuance of the stock certificates. To turn a consequential issue such as this on a party's failure to institute formal legal proceedings in light of the trial court's recognition of how this "closely-held family corporation" had not adhered to "the formalities of law" "since its incorporation in 1961" is certainly puzzling. Rather than implying that Appellant's inactivity constituted acquiescence that effectively amounted to ratification, the trial court should have looked to the historical nature of this corporation's *extremely informal* operation as a more logical explanation for Appellant's inaction.

Similarly questionable is the trial court's conclusion with regard to the consideration offered for the issuance of stock certificate numbers 11 and 13. Essentially, the circuit court decided that the consideration given was for years of services offered to the corporation at little or no pay plus personal moneys Appellant had invested in the corporation. Upon examination, however, these bases fail to withstand scrutiny. After seven years of working on the family farm, the corporation awarded Appellee 60 shares of stock in the subject corporation in 1994. Then only four years later, the corporation (with no knowledge of Appellant—the corporation president) purportedly issued another 120 shares of stock to Appellee upon the same theory—remuneration for unpaid work and contributions to the family farm. Whereas the record reflects that the corporate officers all agreed as to the issuance of the first 60 stock shares to Appellee for this purpose, there was no agreement among the officers as to the second issuance of 120 shares to Appellee.[2]

In looking for additional consideration offered for these stock certificates, the trial court cited Appellee's investment of certain moneys into the family corporation. In calculating those investments, the circuit court determined that two checks for the cumulative amount of $100,000 that each bore the memorandum line notation of "Inv." were outright gifts to Appellee. Incredibly, the trial court concluded that the abbreviation, which certainly suggests that it stands for investment and there was testimony to this effect from Dorothy Novak,[3] was not significant, as the trial court found that the amount was an outright gift to Appellee. Even more questionable is the trial court's decision to place that so-called "gift" on the ledger side of Appellee's investments in the corporation in considering the amount of money that Appellee had invested in the corporation.[4]

After reviewing the record of this case against the findings of the trial court, Appellant's testimony does not appear to have been accorded the proper weight that it deserved. While the trial court resolved most of the credibility decisions in a manner unfavorable to Appellant, the record suggests a pattern of collusive behavior on the part of Appellee and his mother that certainly raised the need to carefully weigh the testimony offered by those parties. Upon careful examination of the facts of this case, I simply cannot reach the same conclusion as the trial court and the majority with regard to the validity of the questioned stock certificates. Accordingly, I must respectfully dissent.

---

2. The corporation's officers approved the issuance of the initial 60 shares of stock issued to Appellee at a shareholders meeting on November 9, 1994. No such meeting reflects the approval of the issuance of the second 120 shares held by Appellee.

3. While the check's signatory, Fred Novak, was not called as a witness at trial, his wife, Dorothy Novak, testified that she and her husband were "investing" in saving the family farm.

4. Of further note is the fact that none of Appellee's personal or individual tax records reflect a reporting of the alleged purchase of the stock by capital contribution or gift to the Internal Revenue Service. Similarly, the corporate records do not reflect any change in the corporation's capitalization or a reporting of such changes to the Internal Revenue Service.

I am authorized to state that Justice STARCHER joins in this dissent.